CITY OF ASPEN, Petitioner,

v.

Mary MESEROLE, Respondent.

No. 89SC637.

Supreme Court of Colorado,
En Banc.

Dec. 24, 1990.

Rehearing Denied Jan. 28, 1991.

Younge & Hockensmith, Earl G. Rhodes,
Grand Junction, for petitioner.

James R. True, Aspen, for respondent.

Justice ERICKSON delivered the
Opinion of the Court.

We granted certiorari to review *Meserole
v. City of Aspen*, 786 P.2d 456 (Colo.App.
1989). We affirm.

I

At approximately 10:00 p.m. on Septem-
ber 20, 1986, Mary Meserole was walking
on the west side of the 200 block of Galena
Street in Aspen, Colorado. She tripped
over a piece of metal, apparently a remnant
of a traffic sign protruding about two
inches out of the sidewalk, fell, and was
injured. On January 29, 1987, Meserole
filed a personal injury complaint against

Aspen. In response, the city filed a motion for summary judgment alleging that it was immune from liability for dangerous conditions present on municipal sidewalks. The district court granted that motion and dismissed the complaint.

The court of appeals reversed, 786 P.2d at 458, holding that section 24–10–106(1)(d), 10A C.R.S. (1988), waived sovereign immunity for injuries occurring on municipal sidewalks, and remanded the case to the district court for trial. We granted Aspen's petition for certiorari, and for the reasons below, now affirm the court of appeals.

## II

As early as 1893, this court barred tort claims against the government based on the judicial creation of sovereign immunity. *Board of County Comm'rs v. Bish*, 18 Colo. 474, 33 P. 184 (1893). The rationale for granting sovereign immunity included the vast array of services provided by the government, thereby exposing it to greater potential liability than nongovernmental entities, and the inability of government to decide not to provide services because its potential liability was too great. *Lee v. Colorado Dept. of Health*, 718 P.2d 221, 227 (Colo.1986) (Governmental Immunity Act does not violate equal protection clause).

In 1971 we stated that judicially imposed sovereign immunity was inappropriate in a modern society, and abolished governmental immunity at the county, school district, and state levels. *Evans v. Board of County Comm'rs*, 174 Colo. 97, 482 P.2d 968 (1971); *Flournoy v. School Dist. # 1*, 174 Colo. 110, 482 P.2d 966 (1971); *Proffitt v. State*, 174 Colo. 113, 482 P.2d 965 (1971). We also said that the General Assembly had the power to restore sovereign immuni-

ty in whole or in part, or to place limits on governmental liability. *Evans*, 174 Colo. at 105, 482 P.2d at 972.[1]

One year later, the General Assembly responded by adopting the Governmental Immunity Act, and the corresponding statute sections 24–10–101 to –117, 10 C.R.S. (1972). In section 24–10–106, the General Assembly waived sovereign immunity for various governmental acts, including:

A dangerous condition which interferes with the movement of traffic on the traveled portion and shoulders or curbs of any public highway, road, street, *or sidewalk* within the corporate limits of any municipality, or of any highway which is part of the federal interstate highway system or the federal primary highway system, or of any paved highway which is a part of the federal secondary highway system, or of any paved highway which is a part of the state highway system on that portion of such highway, road, street, *or sidewalk* which was designed and intended for public travel or parking thereon....

§ 24–10–106(1)(d) (emphasis added). Dangerous condition was defined as:

the physical condition of any public building, public hospital, jail, public highway, road, or street, public facility located in any park or recreation area maintained by a public entity, or public water, gas, sanitation, electrical, power, or swimming facility where the physical condition of such facilities or the use thereof constitutes a risk to the health or safety of the public, which is known to exist or which in the exercise of reasonable care should have been known to exist and which condition is proximately caused by the negligent act or omission of the public entity in constructing or maintaining such facility....

§ 24–10–103(1).

---

1. Although there is a distinction in the common law between municipal liability for governmental and proprietary functions, *see* 5 Prosser, *Law of Torts* § 131 (1984), it is clear that there never was sovereign immunity for improperly maintained municipal sidewalks in Colorado. *See, e.g., City of Denver v. Farmer*, 125 Colo. 462, 244 P.2d 1086 (1952) (municipality has duty of care in maintaining sidewalks designed for pedestrian traffic); *City of Alamosa v. Johnson*, 99 Colo.

134, 60 P.2d 1087 (1936) (municipality required to exercise ordinary care in keeping its sidewalks reasonably safe); *City of Denver v. Magivney*, 44 Colo. 157, 96 P. 1002 (1908) (duty to maintain sidewalks in reasonably safe condition). Whatever immunity is extended to municipalities for dangerous sidewalk conditions must be granted by the General Assembly, and is in derogation of the common law even as it existed before 1971.

In 1986, the General Assembly substantially amended the Governmental Immunity Act partially in response to both case law and to a growing problem of excessively high municipal insurance rates. As amended, section 24–10–106(1)(d) now waives immunity for:

A dangerous condition of a public highway, road, or street which physically interferes with the movement of traffic on the paved portion, if paved, or on the portion customarily used for travel by motor vehicles, if unpaved, of any public highway, road, street, or sidewalk within the corporate limits of any municipality, or of any highway which is part of the federal interstate highway system or the federal primary highway system, or of any highway which is part of the federal secondary highway system, or of any highway which is a part of the state highway system on that portion of such highway, road, street, or sidewalk which was designed and intended for public travel or parking thereon. As used in this section, the phrase "physically interferes with the movement of traffic" shall not include traffic signs, signals, or markings, or the lack thereof. . . .

There is no case in Colorado that interprets whether the Act waived immunity for dangerous conditions on sidewalks prior to the 1986 amendments. A plain reading of the statute supports the interpretation that a municipality did have a duty of reasonable care for maintenance of sidewalks, and the defendant concedes as much. The city argues, however, that the General Assembly intended to change that duty by the 1986 amendments so that immunity is no longer waived for dangerous sidewalk conditions, except in alleys.

Our primary task is to discern the intent of the General Assembly. *Engelbrecht v. Hartford Accident and Indem. Co.,* 680 P.2d 231, 233 (Colo.1984). "To ascertain intent, words and phrases should be given effect according to their plain and obvious meaning." *Id.* Statutes susceptible to more than one meaning, however, must be construed in light "of the apparent legislative intent and purpose," including relevant

statutory history. *Id.;* § 2–4–203, 1B C.R.S. (1980) ("Ambiguous statutes—aids in construction").

Aspen contends that the amended language in the first sentence of section 24–10–106(1)(d)—from, "A dangerous condition which interferes with the movement of traffic on the traveled portion and shoulders or curbs of any public highway, road, street, *or sidewalk* within the corporate limits of any municipality" to, "A dangerous condition of a public highway, road, or street which physically interferes with the movement of traffic on the paved portion, if paved, or on the portion customarily used for travel by motor vehicles, if unpaved, of any public highway, road, street, or sidewalk within the corporate limits of any municipality"—indicates the intent to impose immunity for most sidewalk conditions. Aspen maintains that its interpretation is supported by a plain reading of the statutory words, and that we need not delve into legislative intent. The city acknowledges, however, that the amended statute is ambiguous in that it refers to sidewalks, but contends that the waiver is now limited to only those portions of sidewalks that are used by motor vehicles, such as an alley. The trial court adopted that interpretation.

The court of appeals reversed, and held that the amended statute waived Aspen's immunity for, "A dangerous condition . . . of any public highway, road, street, or *sidewalk* within the corporate limits of any municipality. . . ." 786 P.2d at 457. By holding that the first use of the words "public highway, road, or street" was separate from other clauses of the statute, the court of appeals created a new, fifth category of public thoroughfares in which sovereign immunity for dangerous conditions was waived that included all county roads. We rejected that interpretation in *Bloomer v. Board of County Commissioners,* 799 P.2d 942 (Colo.1990), which held that section 24–10–106(1)(d) did not waive sovereign immunity for dangerous conditions occurring on county roads.[2]

---

2. Under the court of appeals construction, dangerous conditions would no longer have to interfere with traffic on any but the first category of thoroughfares in order for sovereign immuni-

Although we previously rejected the court of appeals formulation of five separate categories of thoroughfares in which immunity was waived, that decision does not resolve the issue before us here. It is impossible to discern the legislative intent regarding sidewalk conditions from the plain language of section 24–10–106(1)(d). It is possible that by adding a new clause providing that a dangerous condition must physically interfere "with the movement of traffic on the paved portion, if paved, or on the portion customarily used for travel by *motor vehicles,* if unpaved," the General Assembly intended to remove liability for injuries sustained on sidewalks except those occurring on portions intended for motor vehicle travel. Yet the sentence begins by limiting the areas affected to public highways, roads, or streets. It is possible that the legislative intent was simply to address liability for injuries occurring on roadways but not to change existing liability for sidewalk injuries, thereby explaining the retention of "sidewalk" in later clauses. Because there is more than one possible construction of section 24–10–106(1)(d), it is incumbent upon us to determine what the intent of the General Assembly was when it enacted the 1986 amendments. *See People v. Terry,* 791 P.2d 374, 376 (Colo.1990).

### A

House Bill 1196, sponsored in chief by State Representative Charles E. Berry, was the underlying bill that amended the Governmental Immunity Act. Both in committee hearings and in an article he co-authored in 1986, entitled Liability and Insurance Reform in Colorado,[3] Representative Berry discussed the motives behind and intent of the 1986 amendments.

Representative Berry wrote that the three main goals of H.B. 1196 were to address judicial constructions that weakened the effectiveness of the Governmental Immunity Act, to address the "insurance crisis" faced by municipalities, and to "insure that the Act would protect public entities and taxpayers from excessive or unpredictable liability."[4] In referring to the significant features of H.B. 1196, Representative Berry stated that it clarified that the immunity act applied to all actions that are or could have been brought in tort. It also clarified that authorized volunteers working for the government were covered by the Act.[5] H.B. 1196 also required specific notice provisions, and a ninety-day "cooling-off" period that gave the government a chance to resolve the claim before a court action was filed.[6]

The amended statute also clarified that the previous limitation on the recovery of damages not to exceed $150,000 per incident for a single person, or $400,000 for two or more people injured in a single incident, applied even if the municipality purchased liability insurance with higher limits. It also removed the connection between purchasing insurance and waiving immunity.[7]

The amendment also provided "that the performance of a service or an act of assistance, or the adoption of a policy or regulation for the protection of any person's health or safety, shall not result in the assumption of a duty of care where

ty to be waived. Our review of the record and the legislative history of section 24–10–106(1)(d) indicates that such a change was not intended.

Under our interpretation, there are four categories of thoroughfares for which immunity is waived in section 24–10–106(1)(d): (1) public highways, roads, streets, or sidewalks within the corporate limits of a municipality; (2) highways within the federal interstate or primary highway systems; (3) highways that are part of the federal secondary system; and (4) highways, roads, streets, or sidewalks that are within the state highway system on the portions designed and intended for public travel or parking thereon.

3. C. Berry & T. Tanoue, Liability and Insurance Reform in Colorado, Including a discussion of reducing the risk of personal liability and of federal civil rights liability (1986), published by the Colorado Municipal League [hereinafter Berry & Tanoue]. *See also* Berry & Tanoue, *Amendments to the Colorado Governmental Immunity Act,* 15 Colo.Law. 1193 (1986).

4. Berry & Tanoue at 1–2.

5. *Id.* at 2.

6. *Id.* at 3.

7. *Id.* at 4–5.

none otherwise existed."[8]  This language was in response to several court decisions involving assumed duty. *See Moreland v. Board of County Comm'rs*, 725 P.2d 1 (Colo.App.1985) (adoption of a building code gives rise to duty to enforce code adequately), *rev'd, Board of County Comm'rs v. Moreland*, 764 P.2d 812 (Colo.1988); *Gilbert v. City of Arvada*, 694 P.2d 847 (Colo. App.1984) (providing school crossing guards at one time of day created duty to provide at other times), *aff'd in part and rev'd in part, Jefferson County School Dist. R–1 v. Gilbert*, 725 P.2d 774 (Colo. 1986); *Justus v. Jefferson County School Dist. R–1*, 683 P.2d 805 (Colo.App.1984) (school handbook containing policy on bicycle riding created duty to enforce policy adequately), *aff'd in part and rev'd in part, Jefferson County School Dist. R–1 v. Justus*, 725 P.2d 767 (Colo.1986).

In addition, the amendment declared that if a public official was immune, the public entity was also immune.[9]  The bill dealt with dangerous conditions as well, and specifically addressed our decisions in *Stephen v. City of Denver*, 659 P.2d 666 (Colo.1983), and *Wheeler v. County of Eagle*, 666 P.2d 559 (Colo.1983).[10]

In *Stephen*, we said that the government could be liable for injuries stemming from improperly maintained street signs based on the statutory interpretation of the Governmental Immunity Act.  We said that "to construe 'dangerous condition' to be limited to the physical condition of the road surface gives too cramped a reading to the statute and ignores the purpose for which this exception to sovereign immunity was created." *Id.* at 668.  According to Representative Berry,

> H.B. 1196 addresses this decision by making it clear that a dangerous condition on a roadway is indeed limited to the physical condition of a road surface.

The bill provides that a dangerous condition of a roadway is one which *physically* interferes with the movement of traffic, and does *not* include traffic signs, signals, or markings, or the lack thereof, with only three exceptions: (1) the failure to repair a stop sign, (2) the failure to repair a yield sign which "reassigned the right-of-way," or (3) the failure to repair a traffic control signal on which conflicting signals are displayed....[11]

In *Wheeler*, we reversed summary judgment in favor of the government when a pedestrian was injured while walking on a county road where there was no sidewalk. "A genuine issue exists as to whether, under the circumstances, the County failed in its duty to exercise reasonable care to ensure the safety of motorists and pedestrians who travel upon County Road 13." 666 P.2d at 561. *Wheeler* was interpreted by the General Assembly as imposing a duty upon counties to place sidewalks next to all roads. Representative Berry wrote that the 1986 amendment dealt with *Wheeler* "by limiting a dangerous condition *on a roadway* to that which occurs on the paved portion of a roadway, if paved, or on the portion customarily used for travel by motor vehicles, if unpaved."[12]

Nothing in the foregoing language suggests that part of the intent of amending the immunities act was to do away with liability for dangerous conditions that existed on municipal sidewalks. Representative Berry's explanation of H.B. 1196 referred only to limiting liability for dangerous conditions "on a roadway." Nor did Representative Berry refer to dangerous conditions on sidewalks when he summarized the bill during the House State Affairs Committee meeting on January 30, 1986. Rather, his only reference to sidewalks was in connection with *Wheeler* and the bill's intent to insure that public entities did not

---

**8.** *Id.* at 5.

**9.** Berry & Tanoue at 6.

**10.** *Id.*

**11.** Berry & Tanoue at 7.

**12.** *Id.* (emphasis added). The remaining sections of the bill addressed liability for accumu-

lations of snow and ice, punitive damages and the failure of plaintiffs to prove willful and wanton conduct, discussed the application of the provisions of the Act to actions brought under 42 U.S.C. § 1983, and declared the effective dates of the bill.

have a duty to build a sidewalk next to every road. Later in that hearing, an unidentified attorney who claimed to have represented the state in liability actions commented upon the provisions dealing with *Wheeler* and said, "If you provide a sidewalk, it's gotta be a safe sidewalk, but you don't have to put sidewalks next to all roads." There was no comment from any participant including Representative Berry suggesting that one purpose of the bill was to adopt a position that sidewalks did not, in fact, have to be safe.

Representative Berry wrote that H.B. 1196 adopted in large measure the recommendations of the Governor's Special Task Force on Tort Liability and Insurance.[13] In that report, the only recommendation that addressed sidewalks declared:

> The Task Force agreed that the adjacent homeowner or property owner should *share* civil liability with the governmental entity which owns the right-of-way in question. Although we do not agree on a precise rule of apportionment, it was felt that liability in such cases should be *divided between the property owner and the public entity* in a manner that would equitably reflect responsibility for the condition that caused the injury.[14]

The apportionment recommendation was not adopted by the General Assembly, and there is no other reference to sidewalks in the Task Force report.

However, during the March 17, 1986, Senate Business Affairs and Labor Committee Hearing, a representative from the Colorado Municipal League testified that the purpose of adding the language in the first part of section 24–10–106(1)(d) was to eliminate redundant language from section 24–10–103 and insure that all the facilities where dangerous conditions could occur were listed in section 24–10–106. "Thus, this amendment does strike some redundancy, *but is not intended to make any substantive changes.*" (Emphasis added.) That comment was surely limited to the words "public highway, road, or street" since the added words that follow were intended, according to the legislative history, to make substantive changes in prior case law. Even in that testimony, however, there is no indication that the amended words were also meant to limit liability for dangerous sidewalk conditions.[15]

In short, there is nothing in the legislative history to support Aspen's interpretation that section 24–10–106(1)(d) limits liability for dangerous sidewalk conditions to alleys. Such an interpretation would amount to a significant change in the existing law and cannot be squared with a legislative history that fails to reflect an intent to provide public entities with sovereign immunity for all dangerous conditions on sidewalks except where they cross alleys.

Because the Governmental Immunity Act is in derogation of the common law of Colorado, legislative grants of immunity must be strictly construed. *See, e.g., Stephen,* 659 P.2d at 668 n. 3; *Pigford v. People,* 197 Colo. 358, 593 P.2d 354 (1979). A fair reading of the statute coupled with the legislative history cannot support a claim that the government is statutorily immune from liability for all dangerous conditions on sidewalks save for alleys. As we have interpreted the amendments, public entities are liable for dangerous conditions on sidewalks, whether it is people or vehicles that are traveling upon them.[16]

---

13. Liability Insurance and the Law of Torts in Colorado, Problems and Remedies. Report of the Special Task Force on Tort Liability and Insurance (January 1986).

14. *Id.* at 106–07 (emphasis added).

15. [Q] [by Senator Allard] I would like to check with Tammy [the Colorado Municipal League representative]. There's no new added provisions as to what actually exists now, is that right?

[A] That's correct. Everything that was taken out of [section 24–10–]103 by this amendment is either already in or would be included into [section 24–10–]106, so it's not intended to take away anything and it's not intended to add anything.

Transcript of *Hearings on H.B. 1196 Before the Senate Business Affairs Committee,* 55th General Assembly (1986) at 8–9 (discussing an amendment requested by the Boulder City Attorney).

16. Aspen also claims that the amendments were aimed at overruling *Martinez v. City of Lakewood,* 655 P.2d 1388 (Colo.App.1982), which Aspen characterizes as a "dangerous condition of sidewalk" case. *Martinez,* however, involved li-

Our decision is not at odds with our opinion in *Bloomer v. Board of County Commissioners*. In *Bloomer*, we said, "The text of subsection 24–10–106(1)(d) is not reasonably susceptible to more than one interpretation on the question of whether subsection 24–10–106(1)(d) waives sovereign immunity for counties in their construction and maintenance of county roads, and it is unnecessary to consider the statute's legislative history." *Id.* at 945 (citation and footnote omitted). Although we disagreed that the 1986 amendments created a new subcategory of roads in which immunity was waived, we did not have occasion to look to the legislative history regarding immunity for sidewalk conditions.

Unlike *Bloomer*, section 24–10–106(1)(d) is ambiguous in that it seems to waive sovereign immunity for sidewalk conditions in part of the statute, but to not waive that immunity in other parts. It is therefore necessary to go beyond the wording and look to the history of the statute to discern the legislative intent.

### B

■ Aspen argues that even if immunity was waived, dangerous conditions do not include the remnants of traffic signs, which is what Meserole tripped on in this case. To that end, Aspen points to the amended language in section 24–10–106(1)(d), which provides that, "As used in this section, the phrase 'physically interferes with the movement of traffic' shall not include traffic signs, signals, or markings, or the lack thereof...."

Even if a two-inch segment of metal can properly be characterized as a "traffic sign," we must again resolve the ambiguity between the wording in section 24–10–106(1)(d) that appears to limit any physical interference to those areas used by motor vehicles but later refers to dangerous con-

ditions that exist on sidewalks. The first part of section 24–10–106(1)(d) provides a waiver of immunity for a "dangerous condition of a public highway, road, or street which physically interferes with the movement of traffic on the paved portion, if paved, or on the portion customarily used for travel by motor vehicles, if unpaved, of any public highway, road, street, or sidewalk within the corporate · limits of any municipality." That section suggests that "physically interferes with the movement of traffic" modifies "sidewalk" and therefore excludes liability for improperly maintained traffic signs. Yet that interpretation does not comport with the apparent legislative intent to limit pre-existing liability for roadway conditions while not addressing liability for dangerous sidewalk conditions.

Again we rely on the legislative history before us, and note that the only context in which traffic signs were discussed was in the dialogue regarding *Stephen* and *Martinez v. City of Lakewood*, 655 P.2d 1388 (Colo.App.1982) (liability for nonenforcement of a no parking sign). Representative Berry limited his discussion of the phrase "physically interferes with the movement of traffic" to dangerous conditions occurring *on a roadway*. The purpose of that portion of the amendment, according to Representative Berry, was to make "it clear that a dangerous condition *on a roadway* is indeed limited to the physical condition of *a road surface*," and that dangerous condition *on a roadway* "does *not* include traffic signs, signals, or markings, or the lack thereof, with only three exceptions ..." not relevant here.[17]

Rather than a circumstance similar to *Stephen*, in which a misdirected stop sign caused a traffic accident, if the metal object that caused Meserole's fall was at one time a traffic sign, all that remained was a two-inch stub that did interfere with foot

---

ability for injuries sustained when the plaintiff was hit by a car while stepping into the street in an area that was unimproved and contained no crosswalks or sidewalks. The plaintiff was injured because the city failed to enforce a no parking sign intended to increase visibility for pedestrians. In committee hearings, *Martinez*

was discussed in conjunction with *Wheeler* and *Stephen* and their concomitant circumstances, rather than any discussion of dangerous conditions on sidewalks once they are built.

**17.** Berry & Tanoue at 7 (emphasis added).

traffic. The legislative history does not support the claim that the General Assembly intended to provide absolute immunity for such a condition on a sidewalk that interferes with pedestrian traffic.

## III

Because there is a statutory ambiguity in the 1986 amendments to section 24–10–106(1)(d), we look beyond the language of the statute to the legislative history for clarification. From that history, we can discern no intent to change the pre-existing governmental liability for dangerous conditions that exist on sidewalks so that immunity is only waived for dangerous conditions, not caused by traffic signs, on those portions of sidewalks intended for motor vehicle traffic.

Accordingly, we affirm the court of appeals and return this case to the court of appeals with directions to remand to the district court for trial.

KIRSHBAUM, J., dissents.

VOLLACK, J., dissents and ROVIRA, C.J., joins in the dissent.

Justice KIRSHBAUM dissenting.

I dissent from the majority's conclusion that the language of section 24–10–106(1)(d), 10A C.R.S. (1988), is ambiguous and that the General Assembly did not intend thereby to exempt public entities from liability for injuries resulting from dangerous conditions physically present on municipal sidewalks.

In interpreting statutory provisions, our duty is to give effect to the intent of the General Assembly. *State v. Hartsough*, 790 P.2d 836, 838 (Colo.1990). When such intent can be gleaned from the words of the statute, no resort to legislative history is necessary. *Estate of David v. Snelson*, 776 P.2d 813, 817 (Colo.1989).

The statute states in pertinent part as follows:

(d) A dangerous condition of a public highway, road, or street which physically interferes with the movement of traffic on the paved portion, if paved, or on the

portion customarily used for travel by motor vehicles, if unpaved, of any public highway, road, street, or sidewalk within the corporate limits of any municipality....

§ 24–10–106(1)(d), 10A C.R.S. (1988). I find this statutory language to be clear and unambiguous. The General Assembly has plainly stated that a public entity's sovereign immunity is waived with respect to a dangerous condition that effectively interferes with traffic on a sidewalk only when that dangerous condition physically exists on a public highway, road, or street. If the condition physically exists on the sidewalk itself, however, such sovereign immunity is not waived. In this case, the latter circumstance exists. I therefore conclude that the City of Aspen is protected by the statute from liability for Meserole's injuries.

Justice VOLLACK dissenting:

I respectfully dissent from the majority's holding that public entities are liable for dangerous conditions on sidewalks affecting pedestrian traffic, based on its interpretation of section 24–10–106(1)(d), 10A C.R.S. (1988), of Colorado's Governmental Immunity Act (Act). In my opinion, the legislature intended to restrict governmental liability in subsection (1)(d) to dangerous conditions on surfaces used by motor vehicles.

We have noted that because governmental immunity is in derogation of Colorado's common law, legislative grants of immunity must be strictly construed. *Stephen v. City and County of Denver*, 659 P.2d 666, 668 n. 3 (Colo.1983). Nevertheless, this court's primary task in construing a statute is to determine and give effect to the intent of the legislature. *State of Colorado v. Hartsough*, 790 P.2d 836, 838 (Colo.1990). If the statutory language is ambiguous, making alternative constructions possible, then a court may look to the legislative history to determine which alternative construction is in accordance with the objective sought to be achieved by the legislation. *Griffin v. S.W. Devanney & Co.*, 775 P.2d 555, 559 (Colo.1989). Moreover, it must be presumed that in enacting the statute the legislature intended that the public interest

is to be favored over any private interest. § 2–4–201(1)(e), 1B C.R.S. (1980).

Section 24–10–106(1)(d) provides in relevant part that sovereign immunity is waived by a municipality in a tort action for injuries resulting from

*[a] dangerous condition of a public highway, road, or street which physically interferes with the movement of traffic on the paved portion, if paved, or on the portion customarily used for travel by motor vehicles, if unpaved, of any public highway, road, street, or sidewalk within the corporate limits of any municipality*.... As used in this section, the phrase "physically interferes with the movement of traffic" shall not include traffic signs, signals, or markings, or the lack thereof, but shall include the failure to repair a stop sign or a yield sign which reassigned the right-of-way or the failure to repair a traffic control signal on which conflicting directions are displayed, if such failure constituted a dangerous condition as defined in section 24–10–103(1).

(Emphasis added). The underscored portion of subsection (1)(d) is ambiguous in that the word "sidewalk" follows the "public highway, road, street" designation in line 7, above; yet, "sidewalk" is absent in the "public highway, road, or street" designation appearing in lines 1 and 2. Recognizing this inherent ambiguity in the statutory language, the majority determined that the legislature intended for municipalities to be liable for injuries resulting from dangerous conditions on sidewalks. In my view, the legislature did not intend such an expansion of the government's liability. Although awkwardly written, the language of subsection (1)(d) is focused on those dangerous conditions existing on surfaces used by motor vehicles. A review of the legislative history makes it clear that the General Assembly intended for subsection (1)(d)'s imposition of government liability to be interpreted narrowly.

Legislative intent may be inferred from an examination of successive drafts of a bill or statute. *Haines v. Colorado State Personnel Bd.*, 39 Colo.App. 459, 461–62, 566 P.2d 1088, 1090 (1977); *Three Bells Ranch Assoc. v. Cache La Poudre Water Users Ass'n*, 758 P.2d 164, 172 (Colo.1988). The Colorado Governmental Immunity Act was originally enacted in 1971, following the introduction of House Bill 1047. A review of prior drafts of the 1971 Act reveals that sidewalk surfaces were not intended to be covered by subsection (1)(d).

The original version of section 24–10–106(1)(d) appeared in section 130–11–6(1)(e) of House Bill 1047, and the first draft read as follows:

A dangerous condition of any *highway, road, or street* within the corporate limits of any municipality, or of any highway which is a part of the federal interstate highway system or the federal primary highway system, or of any paved highway which is a part of the federal secondary highway system, or of any paved highway which is a part of the state highway system.

(Emphasis added). Sidewalks were not mentioned in this version. The engrossed House Bill 1047, as amended, provided:

A dangerous condition *which interferes with the movement of traffic on the traveled portion and shoulders or curbs* of any highway, road, or street within the corporate limits of any municipality, or of any highway which is a part of the federal interstate highway system or the federal primary highway system, or of any paved highway which is a part of the federal secondary highway system, or of any paved highway which is a part of the state highway system, *on that portion of such highway, road, or street which was designed and intended for public travel or parking thereon.*

(Emphasis in original). Again, no mention of sidewalks appeared in this revised draft, but a reference to "curbs" was added. The final language of the 1971 provision approved by the General Assembly and enacted into law, § 130–11–6(1)(e), 1971 Colo. Sess.Laws 1206, added the word "sidewalk," and read as follows:

A dangerous condition which interferes with the movement of traffic on the traveled portion and shoulders *or curbs* of

any public highway, road, street, *or sidewalk* within the corporate limits of any municipality, or of any highway which is a part of the federal interstate highway system or the federal primary highway system, or of any paved highway which is a part of the federal secondary highway system, or of any paved highway which is a part of the state highway system, on that portion of such highway, road, street, or sidewalk which was designed and intended for public travel or parking thereon.

(Emphasis added). Based on the development of this provision, it appears that "sidewalk" was added to correspond to the designation of "curbs." Logically, then, this waiver provision as enacted in 1971 focused solely on highways, roads, streets, and sidewalk *curbs.*

In 1986, the Colorado Governmental Immunity Act was amended by the adoption of House Bill 1196, 1986 Colo.Sess.Laws 873. Subsection (1)(d) was amended as follows:

A dangerous condition OF A PUBLIC HIGHWAY, ROAD, OR STREET which PHYSICALLY interferes with the movement of traffic ~~on the traveled portion and shoulders or curbs~~ ON THE PAVED PORTION, IF PAVED, OR ON THE PORTION CUSTOMARILY USED FOR TRAVEL BY MOTOR VEHICLES, IF UNPAVED, of any public highway, road, street, or sidewalk within the corporate limits of any municipality, or of any highway which is a part of the federal interstate highway system or the federal primary highway system, or of any ~~paved~~ highway which is a part of the federal secondary highway system, or of any ~~paved~~ highway which is a part of the state highway system on that portion of such highway, road, street, or sidewalk which was designed and intended for public travel or parking thereon. AS USED IN THIS SECTION, THE PHRASE "PHYSICALLY INTERFERES WITH THE MOVEMENT OF TRAFFIC" SHALL NOT INCLUDE TRAFFIC SIGNS, SIGNALS, OR MARKINGS, OR THE LACK THEREOF, BUT SHALL INCLUDE THE FAILURE TO REPAIR A STOP SIGN OR A YIELD SIGN WHICH REASSIGNED THE RIGHT–OF–WAY OR THE FAILURE TO REPAIR A TRAFFIC CONTROL SIGNAL ON WHICH CONFLICTING DIRECTIONS ARE DISPLAYED, IF SUCH FAILURE CONSTITUTED A DANGEROUS CONDITION AS DEFINED IN SECTION 24–10–103(1).

Statements by the primary sponsor of House Bill 1196, Representative Charles E. Berry, further elucidate the legislative intent with regard to subsection (1)(d). *See Archer Daniels Midland Co. v. State of Colorado,* 690 P.2d 177, 183 (Colo.1984) (the statements of individual legislators are relevant to judicial inquiry into legislative intent).

In committee hearings and in an article coauthored with Tami Tanoue, a Colorado Municipal League staff attorney, Representative Berry articulated the following purposes for House Bill 1196: (1) to comprehensively review and update the Act since its enactment in 1971, (2) to respond to the liability insurance crisis by protecting public entities and their taxpayers from the fiscal burdens of excessive claims and unlimited liability,[1] and (3) to address certain judicial constructions of the Act which were contrary to the Act's purposes and weakened the effectiveness of some of the Act's provisions.[2]

1. The amendment to the Act's Declaration of Policy, § 24–10–102, reflected this particular concern with the addition of the following legislative rationale:

The general assembly also recognizes that the state and its political subdivisions provide essential public services and functions, and that unlimited liability could disrupt or make prohibitively expensive the provision of such essential public services and functions. The general assembly further recognizes that the taxpayers would ultimately bear the fiscal burdens of unlimited liability, and that limitations on the liability of public entities and public employees are necessary in order to protect the taxpayers against excessive fiscal burdens.

1986 Colo.Sess.Laws 873.

2. Berry & Tanoue, *Colorado Governmental Immunity: H.B. 1196 and Other Recent Developments,* in Liability and Insurance Reform in

Representative Berry wrote that the language of subsection (1)(d) was amended to reflect the legislature's concerns with this court's decisions in *Wheeler v. County of Eagle*, 666 P.2d 559 (Colo.1983), and *Stephen v. City and County of Denver*, 659 P.2d 666 (Colo.1983).[3] *Wheeler* involved an injury to a person struck by a vehicle while walking on a two-lane paved road. The victim apparently was walking on the road because the shoulder was too narrow and blocked by trees and bushes. This court held that a genuine issue existed as to whether the public entity had breached its duty under the circumstances to maintain the roadway in a reasonably safe manner for members of the public who use it. *Wheeler*, 666 P.2d at 561. *Wheeler* was read to impose a new duty on counties to provide sidewalks along county roads for pedestrian safety. According to Representative Berry, House Bill 1196 "addresse[d] this new potential liability by limiting a dangerous condition on a roadway to that which occurs on the paved portion of a roadway, if paved, or on the portion customarily used for travel by motor vehicles, if unpaved."[4] Fearing expanded government liability as a result of *Wheeler*, the legislature therefore amended subsection (1)(d) with the express intent of eliminating government liability for dangerous conditions existing in areas not meant for motor vehicles.

*Stephen* involved a complaint against the City and County of Denver for its alleged failure to repair a turned stop sign. The turned sign made the street upon which the plaintiff was driving appear to be a "through" street and led to her subsequent collision in an intersection. This court declined to construe "dangerous condition" as limited to the "physical condition of the road surface," and subsequently held that the waiver of immunity for a dangerous condition on a roadway applied to traffic signs. *Stephen*, 659 P.2d at 668.

According to Representative Berry,

H.B. 1196 addresse[d] this decision by making it clear that a dangerous condition on a roadway is indeed limited to the physical condition of a road surface. The bill provides that a dangerous condition of a roadway is one which *physically* interferes with the movement of traffic, and does *not* include traffic signs, signals, or markings, or the lack thereof, with only three exceptions: (1) the failure to repair a stop sign, (2) the failure to repair a yield sign which "reassigned the right-of-way," or (3) the failure to repair a traffic control signal on which conflicting signals are displayed, may be found to be a dangerous condition as defined.[5]

(Emphasis in original). This clarification evinces a legislative intent to restrict the waiver of sovereign immunity to dangerous conditions on "road surfaces." Together, Representative Berry's statements demonstrate a clear legislative direction toward narrowing the scope of subsection (1)(d). To construe the statutory language in accordance with the legislative objective, we must, in my opinion, resolve subsection (1)(d)'s ambiguity in a manner that restricts the government's liability. To expand the government's liability to cover dangerous conditions on sidewalks would serve only to frustrate the legislature's objective.

Section 24–10–106(1) mandates that "[a] public entity shall be immune from liability in all claims for injury which lie in tort or could lie in tort," unless an exception applies. Although grants of governmental immunity must be strictly construed, this court must nevertheless give effect to the legislature's intent. The foregoing legislative history reveals a clear purpose by the General Assembly to limit government liability in subsection (1)(d) to dangerous conditions on paved or unpaved road surfaces

---

Colorado 1, 1 (1986) (published by the Colorado Municipal League) [hereinafter *H.B. 1196*]. *See also* Berry & Tanoue, *Amendments to the Colorado Governmental Immunity Act*, 15 Colo.Law. 1193 (1986).

**3.** *H.B. 1196, supra* note 2, at 6–7.

**4.** *Id.*

**5.** *Id.* at 7.

upon which motor vehicles operate. Such an interpretation advances the legislature's goal, which is to narrow, rather than expand, the scope of the exceptions to governmental immunity. In construing subsection (1)(d), we must presume that the legislature intended to favor the public interest over the private interest. We are therefore obligated to adopt a narrow construction of subsection (1)(d) that effectively limits the fiscal burdens of the taxpaying public.

I would reverse the judgment of the court of appeals.

I am authorized to say that Chief Justice ROVIRA joins in this dissent.

